# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRENDA L. ANDERSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 11-455 |
| v. ) | |
| ) | District Judge Cathy Bissoon |
| COMMISSIONER OF ) | Magistrate Judge Cynthia Reed Eddy |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that the Court deny Plaintiff's Motion for Summary Judgment, grant Defendant's Motion for Summary Judgment, and affirm the decision of the administrative law judge ("ALJ").

### II. REPORT

**A.  BACKGROUND**

**1. General**

Brenda L. Anderson ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act").  Plaintiff filed for benefits on August 8, 2008,

claiming an inability to work as of April 1, 2004 due to disability resulting from physical and mental ailments. (R. at 129 – 38, 147 – 59).[1] This matter comes before the court on cross motions for summary judgment. (ECF Nos. 10, 12).

Plaintiff was born on April 13, 1962 and was forty seven years of age at the time of her administrative hearing. (R. at 31). Plaintiff had earned her GED, and obtained a certificate in accounting from a business school. (R. at 32 – 33). Plaintiff lived in a house with her boyfriend, and had a number of adult children. (R. at 32, 49). Past relevant work experience included waitressing, work as a retail clerk, and work as a nurse's aide. (R. at 170). She was last employed in April 2004 as an attendant at a home for mentally disabled adults. (R. at 170, 174).

Plaintiff claimed that she stopped working due to pain and functional limitation stemming from diagnosed Wegener's Granuloma ("Wegener's"). (R. at 151 – 52). In a self-report of day-to-day functionality, Plaintiff explained that her daily activities were limited to watching television and napping. (R. at 160 – 69, 176 – 82). Most chores were taken care of by others, although Plaintiff could drive to the store to do quick grocery shopping and was able to prepare simple meals. (R. at 160 – 69, 176 – 82). Plaintiff allegedly did not sleep well at night, was fatigued, had constant pain of the head, ears, arms, and hands, had lost her sense of taste and smell, had difficulty with fluorescent lights, and had difficulties with her memory. (R. at 160 – 69, 176 – 82). A hole in the hard palate of her mouth made speaking difficult. (R. at 160 – 69, 176 – 82).

Additionally, Plaintiff had suffered significant facial deformity due to Wegener's. (R. at 160 – 69, 176 – 82). She had difficulty using her hands for mundane tasks such as buttoning a shirt. (R. at 160 – 69, 176 – 82). She claimed that there was a period of approximately two

---

[1] Citations to ECF Nos. 5 – 5-10, the Record, *hereinafter*, "R. at __."

years where she was bed ridden by pain, could not bathe, and experienced such swelling of the face that her nose "turned sideways." (R. at 160 – 69, 176 – 82). While her conditions did improve with time, she still felt that her pain was significant enough that she could not work. (R. at 160 – 69, 176 – 82). Plaintiff stated that her doctors, particularly Berrlyn Ferguson, M.D., had thorough documentation of her difficulties. (R. at 160 – 69, 176 – 82). By the time of her application for benefits, Plaintiff's only course of treatment was regular use of prescription pain medication. (R. at 160 – 69, 176 – 82).

### 2. Treatment History

Plaintiff's primary care physician was Edward W. Jew, M.D. He was primarily responsible for the treatment of Plaintiff's physical conditions, including Wegener's. (R. at 222 – 58, 310 – 41). Plaintiff was Dr. Jew's patient at least as early as 2004 – although Dr. Jew's personal notes on the record only begin in November 2007. (R. at 222 – 58, 310 – 41). His last note on record was from August 26, 2009. (R. at 222 – 58, 310 – 41). The majority of Plaintiff's treatment with Dr. Jew consisted of symptom management with prescription pain medications and anti-inflammatory medications. (R. at 222 – 58, 310 – 41). Dr. Jew was also responsible for referring Plaintiff to various specialists in an attempt to control her Wegener's, fibromyalgia, carpal tunnel, and other lesser ailments. (R. at 222 – 58, 310 – 41). Plaintiff regularly complained of pain and sensitivity related to her various conditions. (R. at 222 – 58, 310 – 41).

Dr. Jew sent Plaintiff to see ear, nose, and throat specialist Michael Gottlieb, M.D. on June 29, 2004. (R. at 289). At this meeting, Dr. Gottlieb noted that Plaintiff had also been to another specialist for placement of a fistula plate. (R. at 289). Dr. Gottlieb observed the fistula on Plaintiff's hard palate. (R. at 289). Plaintiff was not seen again by Dr. Gottlieb for several years: once in September 2007, again in September, October, and November of 2008, and again

in June and July of 2009. (R. at 290 – 93). Dr. Gottlieb typically noted diagnoses of Wegener's and fibromyalgia. (R. at 290 – 93).

A CT scan of Plaintiff's paranasal sinuses on June 10, 2004 revealed varying degrees of mucosal thickening within Plaintiff's sinuses. (R. at 205 – 06). Some mucosal thickening showed improvement over results from a previous imaging study, but some mucosal thickening worsened. (R. at 205 – 06). There was mild to moderate mucosal thickening in Plaintiff's nasal passages. (R. at 205 – 06). There was no definite evidence of bony destruction at that time. (R. at 205 – 06).

In early November 2007, Dr. Jew filled out a Pennsylvania Department of Public Welfare Employability Re-assessment Form on behalf of Plaintiff. (R. at 202 – 03). Dr. Jew felt that Plaintiff was permanently disabled from all work, and that she was a candidate for social security benefits. (R. at 202 – 03). Dr. Jew cited Plaintiff's diagnosed Wegener's as the primary cause of Plaintiff's disability. (R. at 202 – 03).

On April 21, 2008, Plaintiff sought treatment in the emergency room due to bilateral numbness of her hands which had persisted for approximately six weeks. (R. at 217 – 18). Hospital staff noted Plaintiff's Wegener's diagnosis. (R. at 217 – 18). Medical notes reveal that the bridge of her nose was flattened due to the progressive loss of facial tissue. (R. at 217 – 18). With respect to her arms and hands, Plaintiff reported weakness, burning, tingling, and numbness. (R. at 217 – 18). She also reported pain in her neck. (R. at 217 – 18). Plaintiff was otherwise normal. (R. at 217 – 18). She was sent for diagnostic imaging. (R. at 217 – 18).

An MRI of Plaintiff's spine on April 21, 2008 revealed a small protrusion, most pronounced at the C5-C6 level of Plaintiff' spine, with flattening of the thecal sac and cord, and mild foraminal encroachment. (R. at 209). A small protrusion was noted at the C6-C7 level of

the spine, as well. (R. at 209). Plaintiff's spine was otherwise unremarkable. (R. at 209). That same day, an MRI of Plaintiff's brain was conducted. (R. at 211). The paranasal sinuses showed near complete opacification with moderate ethmoid and mild frontal sinus disease. (R. at 211). The scan was otherwise unremarkable. (R. at 212).

State agency evaluator Rocco Reynolds completed a physical residual functional capacity assessment ("RFC") on October 6, 2008. (R. at 276 – 82). Upon a review of Plaintiff's medical records, Mr. Reynolds diagnosed Plaintiff with Wegener's disease with facial deformity, and disc protrusions of the C-spine. (R. at 276 – 82). Plaintiff was determined to be limited to occasionally lifting twenty pounds, frequently lifting ten pounds, standing and walking six hours of an eight hour workday, sitting six hours, and only occasionally climbing, balancing, stooping, kneeling, crouching, and crawling. (R. at 276 – 82). Plaintiff was not otherwise limited. (R. at 276 – 82). To support his findings, Mr. Reynolds noted Plaintiff's Wegener's diagnosis and related pain in the hands and face, as well as facial deformity, and found that the aforementioned limitations findings fully accommodated any functional restrictions related to the Wegener's and Plaintiff's spine. (R. at 276 – 82).

In an October 28, 2008 progress note, Dr. Gottlieb indicated that Plaintiff complained of dysphagia, hoarseness, shortness of breath, and cough following the discovery of a thyroid nodule. (R. at 294). With respect to her Wegener's, Plaintiff was noted to have normal external auditory canals and tympanic membranes. (R. at 294). Yet, she also had a large nasal septum perforation as well as necrosis of her left lateral nasal ala and base. (R. at 294). There was also dehiscence of Plaintiff's hard palate. (R. at 294). Plaintiff was evaluated for reconstruction of her nasal ala. (R. at 294).

Plaintiff was referred by Dr. Jew to South Hills Pain and Rehab Associates on July 17, 2009. Plaintiff was treated there until October 2009, and was under the care of Rajesh Mehta, M.D and Anthony Kirby, M.D. (R. at 300 – 08). In her first examination, it was noted that Plaintiff had a history of fibromyalgia and Wegener's, that she had undergone reconstructive surgery for her nose deformity, and that she had been experiencing persistent upper extremity pain, tingling, and numbness. (R. at 300 – 08). Plaintiff did not initially present for treatment of pain related to her Wegener's, however. (R. at 300 – 08).

Plaintiff claimed that her pain was most notable in her hands, but also existed in her forearms, elbows, and neck. (R. at 300 – 08). Dr. Mehta observed that Plaintiff's cervical spine was minimally restricted in range of motion, and pain free, without any upper extremity radiating symptoms. (R. at 300 – 08). Motor exams of the upper extremities showed no focal weakness. (R. at 300 – 08). Sensation was grossly intact. (R. at 300 – 08). Tinel's Sign testing was mildly positive to negative. (R. at 300 – 08). There were no joint inflammatory changes, and only poorly localized elbow tenderness. (R. at 300 – 08). An EMG assessment revealed mild bilateral carpal tunnel, some evidence suggestive of right ulnar neuritis without neuropathic changes, and no evidence of cervical radiculopathy in either upper extremity. (R. at 300 – 08). Based upon Dr. Mehta's examination, it was recommended that Plaintiff use wrist splints at night and avoid leaning on, and repetitive use of, the elbows. (R. at 300 – 08).

Plaintiff first complained of pain related to her Wegener's to Dr. Kirby on September 10, 2009. (R. at 300 – 08). Dr. Kirby noted Plaintiff's longstanding Wegener's diagnosis and Dr. Jew's maintenance of the condition with pain medication to that point. (R. at 300 – 08). Plaintiff reported poor tolerance for temperature extremes, wind, and loud noise. (R. at 300 – 08). The left side of Plaintiff's face and her left ear presented the greatest discomfort. (R. at 300

– 08). Plaintiff claimed that she lost her sense of smell and had ringing in her left ear. (R. at 300 – 08). Activity allegedly exacerbated her discomfort. (R. at 300 – 08). Dr. Kirby noted Plaintiff's facial deformity, as well as past rhinoplasty and reconstruction of her hard palate. (R. at 300 – 08). Plaintiff also had a full upper denture. (R. at 300 – 08). Dr. Kirby diagnosed chronic pain syndrome, Wegener's, carpal tunnel, ulnar neuropathy, and insomnia. (R. at 300 – 08). Plaintiff was prescribed anti-inflammatories and pain medication. (R. at 300 – 08).

At her final visit for pain management on October 10, 2009, Dr. Kirby reported that Plaintiff had experienced an improvement in her symptomology of approximately thirty percent. (R. at 300 – 08). Her tolerance for activity had increased, and she was able to provide care for her grandson. (R. at 300 – 08). Her pain was reported as three or four on a pain scale of ten. (R. at 300 – 08). Activity and weather extremes continued to be problematic for Plaintiff, however. (R. at 300 – 08). Plaintiff's status was otherwise unchanged. (R. at 300 – 08).

Plaintiff was evaluated by Madhusudan Menon, M.D. on December 15, 2009 for the purpose of Plaintiff's disability claim. (R. at 343). Dr. Menon concluded that Plaintiff was only capable of part-time work, but included no functional limitations in his assessment. (R. at 343). Dr. Menon did note that Plaintiff had a history of fibromyalgia, carpal tunnel syndrome, and Wegener's – for which Plaintiff underwent a rhinoplasty. (R. at 343). Plaintiff was found to have "multiple tender points," and chronic pain. (R. at 343).

### 3. Administrative Hearing

At her hearing, the ALJ asked Plaintiff to explain her impairments and functional limitations. Plaintiff described Wegener's as a "bacterial type thing that had eaten away all the cartilage in my face. [I]t ate through my ear canals . . . into my sinuses and down through the roof of my mouth whereas [sic] I ended up with a hole the size of a 50 cent piece in the roof of

7

my mouth." (R. at 36). She stated that the first indications of the disease arose in November 2003, and appeared to simply be an ear infection. (R. at 36). It became progressively worse.

Plaintiff explained that her primary limitations were pain related, particularly when the seasons changed. (R. at 44). Extremes in temperature gave Plaintiff terrible pain due to the severe sensitivity of her face. (R. at 44). Plaintiff's face allegedly swelled, her ears would be painful and ringing, she had no sense of smell, and fluorescent light distressed her. (R. at 44, 52). Plaintiff also testified that her fibromyalgia and carpal tunnel made her arms painful, heavy, tingly, and numb. (R. at 44, 53). It was difficult to grasp anything for an extended period or to pick up something heavy. (R. at 44, 50 – 51). Her pain was worst in the mornings and was exacerbated by activity. (R. at 44). It was difficult for her to simply hold an icepack against her own face. (R. at 45).

Plaintiff stated that she received treatment for her physical ailments once per month in the form of prescription pain medication and anti-inflammatory medication. (R. at 45 – 46). She claimed that she sometimes took up to six prescription pain relievers per day. (R. at 46). Plaintiff mentioned some ancillary memory loss, and was unsure of the etiology, but surmised that her medications may have been the cause. (R. at 46). Plaintiff did not use the splints recommended for treatment of her carpal tunnel, because she believed her carpal tunnel related issues to be "minimal." (R. at 47). She felt that crushed discs in her neck accounted for her arm pain and numbness. (R. at 48). Plaintiff claimed that she underwent dozens of surgeries to mitigate the damage Wegener's had done to her face. (R. at 48). She also stated that she had a surgery to repair the hole in the roof of her mouth. (R. at 48).

Plaintiff testified that she did not engage in much activity on an average day. (R. at 49, 51). She typically watched television, and her family and boyfriend performed most of the

chores. (R. at 49, 51). She claimed that she could not even pick up her grandchildren. (R. at 49). Plaintiff had an aversion to leaving her home due to the reaction of others to her facial deformity. (R. at 50).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work experience would be eligible to engage in a significant number of jobs in existence in the national economy if limited to light work not involving lifting more than ten pounds frequently or twenty pounds occasionally, standing or walking more than six hours a day, sitting more than two hours, working in extreme temperatures, working around loud noises, working under harsh lighting or fluorescent light, manipulating, or gripping. (R. at 58). The vocational expert replied that no jobs would be available to a person who could not work under fluorescent lighting with the other mentioned limitations. (R. at 59).

The ALJ asked the vocational expert to exclude the lighting limitation. (R. at 59). The vocational expert responded that the hypothetical person would be capable of working as a "coin machine collector," with 35,000 positions available in the national economy, as a "cafeteria attendant," with 97,000 positions, or as a "sales attendant," with 44,000 positions. (R. at 59 – 60). The ALJ then altered the hypothetical, such that the person would be limited to sedentary jobs as opposed to light duty jobs. (R. at 61). The vocational expert explained that the hypothetical person would be capable of working as a "charge account clerk," with 39,000 positions, as a "telephone solicitor," with 340,000 positions, or as a "surveillance system monitor," with 21,000 positions. (R. at 61 – 62).

The vocational expert went on to say that in certain office environments, accommodations could be made for an individual who is intolerant of fluorescent lighting. (R. at

64). He also explained that the hypothetical person could miss no more than two or three days of work per month, and that he or she would be required to remain on task at work at least eighty five percent of the workday. (R. at 65 – 66).

B. **ANALYSIS**

**1. Standard of Review**

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work

experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[2], 1383(c)(3)[3]; *Schaudeck v. Comm'r Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the

---

[2] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

**2. Discussion**

In his decision, the ALJ determined that Plaintiff suffered medically determinable severe impairments in the way of Wegener's Syndrome with facial deformity and chronic facial pain, cervical disc protrusion, carpal tunnel syndrome, and ulnar neuropathy. (R. at 11). The ALJ further concluded that these impairments limited Plaintiff to lifting and carrying no more than ten pounds frequently and twenty pounds occasionally, standing and walking no more than six hours per day, sitting no more than two hours, avoiding temperature extremes and loud noises, and no manipulation beyond occasional gripping and use of the fingers. (R. at 14). Based upon the testimony of the vocational expert, the ALJ determined that despite the aforementioned limitations, Plaintiff would still qualify for a significant number of jobs in existence in the national economy. (R. at 21 – 22). Plaintiff was not, therefore, entitled to benefits. (R. at 21 – 22).

Plaintiff objects to the determination of the ALJ, arguing that he committed error by failing to fully credit her subjective complaints of pain, by failing to credit Dr. Jew's statement that Plaintiff was permanently disabled, and – as a result – by failing to formulate a hypothetical

statement and RFC assessment which fully accommodated Plaintiff's functional limitation. (ECF No. 11 at 6 – 25). Defendant counters that all of the ALJ's determinations were supported by substantial evidence, and should be left undisturbed. (ECF No. 13 at 6 – 12).

When rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F.2d at 706). In the present case, the ALJ adequately met his responsibilities under the law.

Plaintiff first argues that her complaints of pain were consistent with her Wegener's diagnosis – a diagnosis which was accepted by the ALJ – yet, the ALJ summarily dismissed Plaintiff's complaints without discussion. (ECF No. 11 at 6 – 9, 15 – 23). The court recognizes that in cases involving subjective complaints of pain and limitation, an ALJ should accord subjective complaints the same treatment as objective medical reports, and weigh the evidence before him. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 122 (3d Cir. 2000). This necessitates a determination by the ALJ as to the extent to which a claimant is accurately stating the degree of his or her disability. *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529(c)). "[I]n all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other

13

symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work." *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 433 (3d Cir. 1999) (emphasis omitted).

Serious consideration must be given to subjective complaints of pain where a medical condition could reasonably produce such pain. *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993). Moreover, there need not be objective evidence of a subjective complaint, and the ALJ must explain his rejection of same. *Id.*; *Burnett*, 220 F.3d at 122. Further, when medical evidence does provide objective support for subjective complaints of pain, the ALJ can only reject such a complaint by providing contrary objective medical evidence. *Mason*, 994 F.2d at 1067-68. However, while pain itself may be disabling, and subjective complaints of pain may support a disability determination, allegations of pain suffered must be consistent with the objective medical evidence on record. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985); *Burnett*, 220 F.3d at 122.

While Plaintiff provides a description of Wegener's in her brief, and asserts that the ALJ erred in failing to discuss the condition and Plaintiff's complaints of pain as they related to the condition, Plaintiff herself fails to point to a place in the record before the ALJ where such a definition was provided. No medical source on record defined Wegener's, and neither did they provide any specific limitations Plaintiff suffered as a result of her Wegener's.

In her brief, Plaintiff goes to great lengths to chronicle her averred pain. However, the ALJ found her claims to be less than convincing for several reasons. For instance, Plaintiff at one point claimed that she had been confined to a bed for the better part of two years due to her pain, and that the files of Dr. Ferguson would corroborate the severity of her restrictions.

14

However, Dr. Ferguson provided no such documentation. (R. at 16, 272 – 75). In fact, Dr. Ferguson stated that Plaintiff had not been seen since July 29, 2004. (R. at 16, 272 – 75). It was further indicated that Dr. Ferguson would not be willing to perform additional examination or testing for the purpose of Plaintiff's disability claim. (R. at 16, 272 – 75). Another instance includes Plaintiff's claim that she underwent surgery to repair the fistula on the roof of her mouth. (R. at 16). While several doctors indicated that Plaintiff had reported undergoing this procedure, there were no medical records provided to actually corroborate Plaintiff's statement. (R. at 16). Also, at the administrative hearing, Plaintiff complained of significant pain and limitation with respect to her arms and hands, yet, conversely admitted that her carpal tunnel was "minimal." (R. at 20, 47). Diagnostic imaging and testing did not support further claims that the condition of her spine contributed significantly to the averred pain and limitation in Plaintiff's arms, either. (R. at 18 – 19).

Generally speaking, there were large gaps between treatments throughout the medical record following Plaintiff's alleged onset in 2004. (R. at 13 – 20). It was not until 2007 that Plaintiff actually received treatment for her Wegener's. (R. at 13 – 20). It was not until 2008 that the medical record began to indicate that Plaintiff suffered pain and numbness in her arms and hands. (R. at 13 – 20). Even after these dates, the medical record failed to illustrate regular treatment. (R. at 13 – 20). Most of Plaintiff's interactions with Dr. Jew – having the most prolific treatment records in the case – were abbreviated telephone conversations for refills of prescription medication. (R. at 13 – 20).

With respect to physical examinations on the record, Plaintiff's pain and restriction were typically indicated to be minimal to moderate; diagnostic imagining and testing also revealed only minimal abnormality. (R. at 13 – 20). With treatment in pain management after three

recorded visits with Drs. Mehta and Kirby, Plaintiff saw a thirty percent improvement in her pain. (R. at 13 – 20). The ALJ also pointed out that none of Plaintiff's treating sources made objective findings regarding memory loss, headaches, or fluorescent lighting. (R. at 13 – 20).

At present, the ALJ thoroughly discussed a sporadic treatment record which did not reflect all of the subjective claims made by Plaintiff. The ALJ acknowledged that Plaintiff suffered from some significant conditions, but that the medical record did not indicate that they imparted a degree of pain and limitation as severe as claimed by Plaintiff. (R. at 13 – 20). The court is inclined to agree. The ALJ provided substantial evidence to find that Plaintiff's credibility with respect to her subjective complaints was diminished and due less than full weight.

Plaintiff next argues that the ALJ erred in failing to defer to the opinion of Dr. Jew regarding Plaintiff's inability to work. (ECF No. 11 at 10 – 14). Plaintiff's other treating sources allegedly corroborated Dr. Jew's disability findings with objective medical evidence. (ECF No. 11 at 10 – 14). With respect to treating medical sources, the Court of Appeals for the Third Circuit has held that a treating physician's opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F.2d 1348, 1350 (3d Cir. 1987)). However, a showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Id.*

16

While it is not expected that the ALJ's explanation match the rigor of "medical or scientific analysis" a medical professional might provide in justifying his or her decisions, it is expected that when rejecting a treating physician's findings or according such findings less weight, the ALJ will be as "comprehensive and analytical as feasible," and provide the factual foundation for his decision and the specific findings that were rejected. *Cotter*, 642 F.2d at 705. The explanation should allow a reviewing court the ability to determine if "significant probative evidence was not credited or simply ignored." *Fargnoli*, 247 F.3d at 42. The ALJ "cannot reject evidence for no reason or for the wrong reason." *Morales v. Apfel*, 255 F.3d 310, 317 (3d Cir. 2000) (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)). Moreover, the ALJ "should not substitute his lay opinion for the medical opinion of experts," or engage in "pure speculation" unsupported by the record. *Id.* at 318-19; *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984). However, the determination of disabled status for purposes of receiving SSI – a decision reserved for the Commissioner, only – will not be affected by a medical source simply because it states that a claimant is "disabled," or "unable to work." 20 C.F.R. § 416.927(e).

As pointed out by Plaintiff, and acknowledged by the ALJ, Dr. Jew found Plaintiff to be permanently disabled. However, Dr. Jew did not provide any limitations findings or objective medical evidence to support this assertion. (R. at 19 – 20). While his opinion of Plaintiff's ability to work is certainly relevant evidence, the ultimate determination of disability status for purposes of receiving social security benefits is the sole province of the ALJ. Without accompanying explanation, there is no reason that the ALJ should have accorded Dr. Jew's conclusion great weight. Dr. Jew's treatment notes – already sparse – provided no examples of functional limitations. Neither did the findings of Drs. Gottlieb, Menon, Mehta, and Kirby provide significant information regarding limitations. While these doctor's certainly noted that

17

Plaintiff was in pain, the treatment record spanning 2004 through 2009 was sporadic and lacking in substantial detail, particularly where Plaintiff's ability to work was concerned.  A physical RFC assessment of Plaintiff's functional capacity was completed, and the ALJ included greater limitations in his ultimate RFC assessment then was provided in the state agency evaluator's assessment – basing his additional limitations findings on Plaintiff's subjective complaints and notes by Drs. Mehta and Kirby.  (R. at 19 – 20).  In spite of this, a vocational expert felt that a person with such limitations was still capable of work.  There is no doubt that Plaintiff suffered the ill-effects of a number of unfortunate disorders.  However, Plaintiff's medical records provided little in the way of evidence of a complete inability to work as a result of these ill-effects – and the ALJ explicitly relied upon this lack of objective proof.

Finally, with respect to Plaintiff's contention that the ALJ's hypothetical question and RFC assessment were inadequate to convey all of Plaintiff's credible limitations, in light of the above discussion, it is clear that the ALJ provided a thorough analysis of the medical evidence underlying Plaintiff's claim for disability benefits.  This court can conclude nothing other than that all the credibly establishing medical impairments suffered by Plaintiff were properly incorporated into the hypothetical to the vocational expert and were accommodated fully in the ALJ's RFC assessment.  Therefore, the ALJ's hypothetical and RFC assessment were not flawed.

## C.     CONCLUSION

Based upon the foregoing, the ALJ provided a sufficient evidentiary basis to allow this court to conclude that substantial evidence supported her decision.  Accordingly, it is

respectfully recommended that Plaintiff's Motion for Summary Judgment be denied, Defendant's Motion for Summary Judgment be granted, and the decision of the ALJ be affirmed.

In accordance with the Magistrates Act, 20 U.S.C. § 636(b)(1) (B) and (C), and Rule 72.D.2 of the Local Rules for Magistrates, objections to this Report and Recommendation must be filed by February 15, 2012. Failure to file objections will waive the right to appeal. *Brightwell v. Lehman*, 637 F.3d 187, 193 n. 7 (3d Cir. 2011).

*s/ Cynthia Reed Eddy*
Cynthia Reed Eddy
United States Magistrate Judge

Dated: January 31, 2012
cc/ecf: All counsel of record.